is case number 417-0127 and 416-0827. I would like the parties to step up and identify who you represent and state your name, please. Those who will be arguing. Thank you. Steve Jokic, Melissa Auerbach, Brad Smith, House of 31. Thank you. Tom Bradley and Mark Bennett and Dave Bohr on behalf of the State of Illinois. All right. And we're going to go first with Mr. Jokic. Is that correct? That's correct. All right. And you may remain if you'll take your seat, sir. Thank you. You may proceed, counsel. May it please the court, my name is Steve Jokic. I'm here with my colleague Melissa Auerbach on behalf of AFSCME Council 31, which is the petitioner in case 127 and the respondent in case 027. And we're here because the labor board decision in this case wrongly relied on what it called a single critical issue impasse test to decide the case in front of it. And we're here because basically the board got it all wrong when they applied the test. They didn't make the requisite factual findings they should have made. And when they applied the test, they applied it in a way that was different than the cases from the National Labor Relations Board that they relied on. Counsel, let me ask you this. So we know there's the Taft case, which is what they've applied the factors in that in the past. Is it your position that they aren't allowed to elect to apply a different test? Well, it's our position that, first of all, that they have to explain why they're doing what they're doing. In this case, they announced we're going to apply the single critical issue impasse test, where in prior cases they had always applied the Taft factors. They have a duty at least to explain why they're using a different test. Moreover, the critical issue impasse test as applied by other labor boards includes an evaluation of the Taft factors in prong three. So it really doesn't make all that much difference. When you do it correctly, is that what you're saying? If you apply the critical issue impasse test correctly, when you get to the third prong, which is that has there been an impasse overall in negotiations, you have to look at what's in the Taft factors. And as I'll talk about in a couple of minutes, you have to look at the factor of the contemporaneous understanding of the parties, and you have to look at the factor of the overall good faith of the parties, including whether the parties have committed any unfair labor practices on the important issues in negotiations. Did CMS argue that the single critical issue test should be adopted? Before the hearing officer, they argued in addition to the Taft factors, they argued that there was a species of the Taft factors called the single critical issue impasse test. And they argued that to the board as well. Here's what I'm trying to get at, viewing this from the point of view as a trial judge. If a party is arguing a particular position to the court, the other side is arguing against it. The court says, I agree with the first party, and I'm going to adopt that argument. Typically, this court is not going to say, but judge, you have to explain in detail what you've said, if the lawyers for the first party have explained it in detail, because the inference we would draw is the judge was persuaded by the arguments presented by the party whose position the court adopted. So I suppose what I'm saying here is when you're talking about how the board failed to explain why they changed to adopt the critical single issue test, I'm not sure, but let's assume for the moment CMS made a compelling argument to the board in the board's eyes. We would disagree, but let's assume for the moment. This is really why you should adopt it here. And the board was absolutely persuaded by this brilliant rhetoric and analysis. Other than saying, yeah, what he said, what else did they have to say? So I think an administrative agency is different than a trial court, Your Honor. An administrative agency is entitled to deference on appeal with respect to the legal standards that it chooses, because it has the obligation to be knowledgeable in a specific area and also to apply its expertise to the facts at hand. In this case, and if you look at the federal cases that we cite in our brief, the National Labor Relations Board has often been held to exactly that type of standard in the courts of appeals of the United States. And so it's our position that the board has an obligation to at least describe why it's doing what it's doing. Maybe if the board had said, we agree with the brilliantly reasoned argument of CMS on page 35 of their brief, that would be a different case, because then we could track why they did what they did, but we can't really discern from the board decision why they decided to use a new test as opposed to the one that they had done in their other cases. The other thing that I would say, Your Honor, is that we have an administrative agency here that regulates parties that are in an ongoing relationship. It's not like your typical case before a trial court, which is a one-shot deal. And where you have parties that are in an ongoing relationship, they need to know what the standards are, they can't guide their conduct in that relationship. If the standard for impasse is going to change, we should know that before we bargain, so that we can take appropriate steps to protect our legal position. That's usually not the case in the typical case you have before a trial court, and that's why administrative agencies have a special duty to elaborate on the reasons why they're doing what they're doing when they decide to do something differently. Now, the critical issue impasse test that the board relied on, and incited federal cases for this, especially the CalMAP case, has three components. One component is that there has to be an impasse on the issue that is alleged to be critical. A second is that the issue has, in fact, it does have to be critical. And a third is that the impasse on that critical issue led to a breakdown in all of the negotiations. And when it looks at number three, the CalMAP case and every other case that deals with the single-issue impasse case that has been decided by the National Labor Relations Board, you look at the TAF factors. And the TAF factors include what was the contemporaneous understanding of the parties, and they include what was the good faith of the parties on other issues that were important in negotiations. I'm going to go in reverse order. I'm going to first look at the issue of whether there was any evidence that the impasse on subcontracting prevented progress on other issues. Let me ask this, because there's another issue presented in this appeal that I wanted to get your thoughts on. It has to address it. That is the absence of direct examination, the affidavits which were submitted in lieu of direct examination, and that was cross-examination. Yes. You objected to that. We did. You asked for direct examination, and that didn't occur. But cross-examination did occur? Yes. Let's assume for the moment, and this is like in a trial court situation, we agree with you that the ALJ erred by denying the direct examination. One of the questions typically on appeal, to put broadly, is no one is entitled to a perfect trial, they're entitled to a fair trial. So if there was error, the question is could it have been harmless, or another way to put it is what prejudice did you suffer as a result of the error committed by the ALJ in denying you direct examination? We discussed this extensively in our briefs, and the evidence indicated from the cross-examination that it was the lawyer for CMS that wrote the affidavit that formed the basis of the direct examination. And looking at it from the perspective of a trial lawyer, I think it gives the party an enormous advantage for the lawyer to be able to write the direct examination. Because we could all think of cases where we were trying them, and boy, it didn't come out the way that we planned for it to come out. And so I think it's, at this point, it would be very difficult to go back and unstrangle the eggs and to say we were prejudiced because there was no testimony in X or Y or Z. I'm sure I could do it because, you know, I was there for the whole 25 days. I think it's really important for the court now, at this juncture, after we've had a 10,000-page record, to indicate what it thinks of this procedure. Because I think it's a wrong procedure to employ at the administrative level, and we don't think that the board had even the authority to employ it under either its rules or the administrative procedures. Well, thank you for that. Now, I apologize for interrupting your argument, but I wanted to get your thoughts on that quickly, and I'll let you proceed. Okay. So on point three of the critical issue impasse test, you have to show that the impasse on subcontracting prevented progress on the other issues on the table. And as the court pointed out when it issued the stay order in this case on March 1 of 2017, there was no evidence that the union ever said give up on subcontracting or else we're not going to give up on other issues. And there was no evidence that central management services said that either. And, in fact, Was there ever any indication by CMS at some point during the negotiations, before they declared impasse, that we're getting to the point where this is about as far as we're going to go on any of the issues? So I would say that if you look at their last, best, and final offer, it had 12 different packages in it. Those packages were presented at various points beginning in September of 2015, leading all the way up to January of 2016. And it did not say when it presented any of those packages that we're done, that this is the farthest we can go, that it had room to move. Second question, are they required to? Well, I think they're required to for two reasons. Number one, I think it bears on their intent. If a party has gone as far as it can go, then I think it is logical to expect that they will say so. There's no benefit to either the process or to either side for the declaration of impasse to be a surprise. Second, I think it bears on whether, in terms of bargaining policy, what do you want to have the rules of engagement be? Do you want the parties to know when they're getting close to impasse? Do you want one side to say, hey, we're close to our bottom line, what's your bottom line? Or do you want that to be a surprise at the end of the day? And I think where you're talking about a unit of 40,000 state employees, you should have rules that go against the element of surprise, as opposed to rules that permit one party to say, hey, remember that proposal in September? Well, that was as far as we can go, even though we haven't told you that for the last four months. And we want to declare impasse over that proposal. With that need for some sort of indication that we're reaching the end point here, do you think it would be more relevant when negotiations are conducted in this fashion, where it was packaged items as opposed to item-by-item negotiations? I think every negotiation is different, Your Honor. In this particular case, while there were 12 packages, there were really about 20 different issues because of the way some of the issues were packaged. And it seemed like things moved sometimes from package to package. And things would move from package to package because the parties would seek to find a way to frame things so that they could keep going. But you could easily imagine different scenarios where if you were doing item-by-item, you might look at the evidence differently. So I would really say that while it's important to have a rule that encourages parties to say that they're opposed to impasse, it's hard to apply that to any specific case without knowing the facts of that specific case. In the instant case, the parties were actively negotiating about a lot of different issues. At the same time, they were negotiating about subcontracting. And the hearing officer found, as a matter of fact, that the parties had not exhausted bargaining on issues such as semi-automatic insurance progression, drug and alcohol testing and health and safety, and on layoffs, and on outstanding economics. And outstanding economics included issues of overtime and retiree benefits. So on some really important issues between the parties, the hearing officer found that the parties were still moving, that there was no impasse. The board adopted those findings in its decision, because it adopted almost all of the fact findings of the hearing officer. And the state has not appealed or argued that those fact findings on those specific issues were clearly erroneous. And so there's lots of evidence that the fact that the parties had differences of opinion over the issue of subcontracting wasn't undermining their ability to bargain about the other issues that were in bargaining, wages and insurance, layoffs, bumping, all of those other issues. And so we think that the evidence does not support the initial sort of factual predicate, i.e., that the alleged impasse in subcontracting caused everything else to break down. Now, another point in the single critical issue test is the point of whether the issue was really critical in bargaining. And there's no denying that subcontracting and other issues were important issues in bargaining, but if you read the post-hearing brief that CMS filed with the hearing officer, they didn't list what issues they thought were critical. By the way, let me ask one other question along this line. Sometimes trial court, sometimes this court, comes up with what might be called alternative grounds for reasons. Sure. An example would be if the board in this case said, we're going to apply the single critical issue test here and explain why, and explain why upon applying it they agreed with CMS's position. They could have then said, we note that if we were to still apply the traditional Taft five-factor test, the result would be the same, but we're indicating that henceforth we're going to be using the single critical issue test. I just want to make sure that it is your understanding that's not what happened in this case. That's not what happened. They said, we're applying the single critical issue test, that's why we agree with CMS, period. That's right. One sentence in the 26-page opinion. I just wanted to make sure there was no alternative holding. No alternative holding. On point one of the critical issue impasse test, you look at was there a good faith impasse. And as I indicated a couple of moments ago, when you look at whether there's a good faith impasse, you look at, number one, you look at the Taft factors. And included in the Taft factors are the factor of the contemporaneous understanding of the parties and the good faith of the parties. Now, on the issue of contemporaneous understanding, the hearing officer specifically found that when the CMS announced its impasse, that the union was shocked, that it was surprised, and that it disagreed, and so that the union did not have a contemporaneous understanding that impasse had been reached as of that day. CMS says that, well, they ask me, negotiators are trained to always say they're shocked and have no idea that this is happening. Well, that's not exactly what they said, but I'll give it to you exactly the way you put it. And the problem with that is that that comes from cases where when they said the next sentence, well, do you have any more proposals, the answer was no. In this case, there were proposals made that very morning that had never been responded to. And there were other proposals that had been made the day before that were never responded to either. Some of which the ALJ has found should have been responded to, and it was a violation of the act for them not to. Yes, yes, that's exactly right. And so it would be our position that there's a wide difference between a case where somebody says, don't stop now, I can think of something more to say, and a case like this one where proposals had been presented that very moment on the things that they claim that are critical issues, such as wages and insurance. When you say good faith impasse, do you mean both actual impasse and legal impasse? That's how prong free has been interpreted. Because you take into account the contemporaneous understanding of the parties, and you also take into account whether the parties have committed any unfair labor practices. And, you know, there's a whole list of unfair labor practices that were committed in this case that undermine any claim of good faith impasse for that reason. On that point, before your time runs out, I want to ask you quickly, there were discovery issues in this case. You asked for materials that you didn't get? Yes. What were they? We asked for a list of the criteria that they thought they would use to determine who was a highly performing employee for the purposes of salary. We asked for the cost savings that would be generated by various changes to the insurance plan, such as changes to deductibles, co-pays, co-insurance, out-of-pocket maximums at various different levels. We asked for them to provide us information on their proposal to be able to bypass seniority if you had a situation where a minority group was underutilized. We asked for them to cost out the savings that would be achieved by our proposal on vacation pay, because our proposal on vacation pay started with the contract rather than their proposal. Did they provide responses to that? They never provided the criteria, even though they said they would. They never provided the cost insurance savings information. They provided the underutilization information on January 7th, late in the day, and they declared impasse the next day. They never provided the information on vacation. Did the ALJ conclude that these were violations? The ALJ did, and with respect to wages and insurance, the ALJ made specific findings that these were violations that interfered with the union's ability to bargain and to represent its members. So is your position that these violations by themselves are enough to overcome the conclusion of an impasse? That's right. That's right. Thank you. Thank you, Counselor. We're actually out of time at this point. You will have time on rebuttal. Okay. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, I'm Tom Bradley on behalf of the State of Omaha. Go ahead. Thank you. I should have let you say your name before I asked you a question. Go ahead. I wanted to ask you about the request for information that counsel was talking about was provided and supposedly not responded to. With respect to the high-performing employees, was there at one point an agreement that the parties would come together and determine those factors and determine that? There was, Judge. Okay. And their statement that they didn't get this information is a little bit disingenuous because they told the State over and over they would never agree to merit pay. Never. Never. So their complaint that they didn't get information about the merit pay plan, first of all, is not completely correct. But if you provide the information, though, doesn't that put the onus on them in the eyes of the Board and the ALJ to say, hey, you know, you're not responding in good faith to this offer? Right, Judge. The response is not to give the information, is it? Well, Judge, the State actually gave them information saying that the merit pay plan would be based in part on attendance and part on some other factors. They wanted some additional information with regard to high-performing employees. I guess the point that I was making is it's not really bad faith bargaining when you don't give that information when the other side has said we're never going to agree to merit pay. What do they need the information for? Because if I'm the ALJ, I say respond to that. Understand, Judge. And, you know, as I say, I just don't understand. Their position is total obstructionist, so I'm not going to provide the information that they need to respond in good faith if they were going to do it. Right. And the ALJ and the Board found that the nonprovision of this information is not what caused the overall impasse between the parties. So it's not determinative of the impasse issue. It was found to be an unfair labor practice. It was found to be an unfair labor practice, Judge. And I may be wrong, but I thought the progression was they requested the information. Initially, the response was we'll get it to you several times. They request the information again, and now the response is, well, this is something that we're going to work out together. And that's correct. I think I said that that is correct. They then requested information specifically on the criteria that were going to be determined to find these high-performing employees, which you again acknowledged you would get to them and then never did. Well, there was some information provided on employees and what the qualifications would be to qualify for merit pay. First of all, the merit pay program was something that not every employee had to participate in. If you didn't want to be entitled to receive the merit pay, you didn't have to participate in this program. It was an optional thing that an employee could do. Secondly, the State gave them information with regard to attendance and other factors that would trigger merit pay payments. Third, they said they would never agree under any circumstances to a merit pay plan. And fourth, the ALJ expressly found that whatever this dispute was on information over merit pay, it didn't cause the impasse between the parties and therefore should not preclude this Court from affirming the Labor Board's finding that the parties are at impasse. Well, if you accept the critical issue. Either way, Judge. No, either way, Judge. Because, first of all, the single critical issue test was found in this case because, I don't think there's any question that subcontracting was a critical issue, and it was found to be an insurmountable obstacle to ever getting an overall agreement. When you have a problem between the parties that's an insurmountable obstacle, you're never going to have a collective bargaining agreement between those parties. But this Court can affirm for any basis in the record. That's what it held in the CMS case ten years ago on an administrative review from a Labor Board decision. And the record clearly shows that the parties are also at impasse if you apply the TAF factors because four of the five TAF factors were found to weigh in favor of impasse, and the law is clear that it's a totality of circumstances test. Ashmey's argument that the fifth factor somehow trumps the other four factors has no basis in the law. Their argument that... Well, even in those factors that she found might have been met with regard to impasse, she also found that there were legal impediments to declaring impasse, did she not? She did find that there were some legal impediments. However, the factual finding also says that the ULPs that were committed in this case are not what caused the impasse between the parties. So a ULP, the relationship between ULPs and impasse is as follows. Nobody should commit ULPs. However, a ULP only prevents impasse from taking place if it causes the impasse. And the factual record here, which the Labor Board accepted, establishes that it wasn't the ULPs that caused the impasse. Now, the Labor Board hung its hat on the single critical issue because it was so clear that subcontracting was an insurmountable obstacle, that's what they said, to ever reaching an overall agreement, and therefore the parties needed to have a declaration of impasse so they could apply a little pressure to one another so they could reach a final collective bargaining agreement. That's the whole point of impasse. Counsel, what's your response to opposing counsel's position that they didn't explain and they're required to explain the basis for their finding of an impasse using the single critical element test? Judge, the ALJ wrote, I think, a 250-page opinion. The Labor Board wrote a 20-some page opinion adopting virtually all of the ALJ's factual findings. But did the ALJ reject the critical single issue test? The ALJ did not reject it. She suggested a third proposal, which was a package-by-package analysis. The Labor Board did not accept. That has never been accepted. Did she specifically recommend that they not adopt the critical single factor test? She suggested that they adopt a package-by-package analysis rather than the single critical issue test. So then when the Board adopted the single critical issue test, they didn't adopt what the ALJ had said on that. They adopted all of her factual findings. But they didn't adopt the test. They didn't adopt her analysis of the single critical issue test. That's right. Did you explain to the Board or to the ALJ, you heard my question to Mr. Jokic, about setting forth all of the reasons why the single critical issue test should be adopted in lieu of the TAF factors? Well, I think they made it clear, Judge. They went on for several pages talking about the single critical issue test, and they found all three factors. And they expressly said what the D.C. Circuit said was the basis for the third factor, which is whether or not the impasse over the single critical issue creates an insurmountable obstacle. So they never used this test before, though, had it? The Board had not, no, Judge. So the question is, was it sufficiently explained by the Board as to why they were adopting this test now and no longer using the five TAF factors? It was, Judge. I don't think they were replacing the TAF test with the single critical issue test. Those two tests look at impasse from different vantage points. The single critical issue test looks at it from the standpoint of asking whether there's a single issue, which creates an insurmountable obstacle to the parties reaching agreement. The TAF test analyzes impasse from an overall standpoint. Let me also quickly, as I asked Mr. Jokic, to ask about this direct examination matter. We've been doing this a long time. I've never before heard in a contested litigation, administrative hearing or otherwise, where a party says, we wish to present on direct examination of what this we're going to call affidavits. The question is, how many were there? So, Judge, it was my idea, so I can tell you where it comes from. Well, the first question is, how many did you submit? How many witnesses are we talking about? We submitted five or six, I believe, witnesses via pre-filed direct. Pre-filed direct is used at the ICC. I used to practice in front of the ICC. They use it all the time. It's a tremendous – They have a specific provision. I'm sorry? They have a specific provision. That's correct. That's correct, and the Labor Board doesn't have that provision. And the Labor Board is a creature of statute. That's correct. It only has the powers which are granted to it by statute. Right, but the Act doesn't prevent you from filing pre-filed direct. In fact, it says that the Labor Board is authorized to appoint ALJs to hold hearings. It doesn't say anything in the Act that you can't do this. It's a tremendous advantage. It's not a question of it doesn't say, therefore you can't. It's you're a creature of statute, so you only have those powers which are granted to you by statute. Right, and they have the power to appoint ALJs to hold hearings, and it's a tremendous advantage to the other side. Because here's what usually happens at trial. Usually at trial, the witness gets up. There's no discovery. There's no depositions. You have no idea what the witness is going to say. You hear for the first time what the witness's testimony is. You scribble down notes. You try to cobble together a cross. You get up there and do the cross. Here, you get the direct 30 days beforehand. So Mr. Jokic is making the silly argument about how he's the great beneficiary of your affidavits, and he doesn't even realize it. He is a great beneficiary of those affidavits. It gave him the opportunity to do a great cross because he knew for 30 days what our witnesses were going to say. But somehow he objected at the time and continues to object. Judge, I wish he had given me what his witnesses were going to testify to 30 days beforehand. Well, it's a default position. Why don't you just call witnesses? This is a 27-day hearing, and put them on and let the system go. Because, Judge, in this case, the state was losing $25 million a month because it couldn't implement its health insurance plan. So what we presented to the Labor Board was an affidavit from CMS Benefits saying we're losing $25 million a month. We need to move this process along to save taxpayer money in this case. That was the only reason we did this. So your five witnesses presented the direct examination by affidavit instead of just calling them to testify. How many days is that going to save? No, Judge, we did call them to testify. They sat on the stand. No, I know. And cross-examination. So my question is how much time is saved by having an affidavit for the direct examination instead of just calling them? Well, some of the affidavits were pretty long, Judge. So a day's worth of direct examination for five witnesses? Judge, we were trying to save the state some money. That's all we were trying to do here. We were not trying to disadvantage anyone. Well, when they objected, why didn't you think, well, maybe this is not a good idea since there's no precedent to proving it, and maybe down the line someplace some court's going to say, no, it's a bad idea. It's prejudicial, and you shouldn't have done it, and we're going to reverse. I mean, you know, the Cost-Benefit Analysis Council is what I'm looking at here. I understand, Judge. The ALJ said that any party that wanted to do this could do this and asked we had no obligation to do it if they didn't want to do it. But you requested it. It wasn't the ALJ's idea. No, Judge, it was my idea. Your motion. Right. They objected. You had a hearing on it. Right. Judge ruled in your favor. Yes. They asked to reconsider it. She still ruled in your favor. Yes, Judge. Okay. So we did what the ALJ said we could do. I don't see that there's any prejudice to them as a result of having our direct testimony 30 days ahead of time when we had it minutes before they stepped up on the scene. And when you say the state was losing $25 million, what was that? A month. A month. So the state calculated that if it could have implemented its last, best, and final offer, which is what it has allowed you to do. What you're saying they were losing was based on what you were proposing to do with the health care. Yes, Judge. Program, not as it currently existed. Not as it currently existed. Okay. That's right, Judge. Yeah, that's right. That's right. Did you ask Mr. Yochish to submit affidavits for his witnesses and direct examination for your benefit? I did not, Judge. Oh. It would have been nice. It would have been nice if we could have depositions or any of that advance look at what they were going to testify to. I did not ask him to do that. In the end, I don't think that they were harmed, and we were just trying to save the taxpayers some money. So the appellate court should affirm under the single critical issue test, because the Labor Board correctly found that the impasse over subcontracting was an insurmountable obstacle. And the Labor Act itself expressly authorizes the Labor Board to, and I'm going to quote here, develop and effectuate impasse resolution procedures. And the Board did that in this case by applying well-established federal law, as the Supreme Court has previously held the Board should do. Thus, the Board's finding that the parties are at overall impasse because their impasse on subcontracting created an insurmountable obstacle to such an overall agreement should be affirmed. So counsel, is it your position that the Board accurately applied the single critical issue test? I mean, the opposing counsel says they didn't consider the TAF factors as required under that test, and they didn't apply it the way the National Labor Relations Board applies it. Do you disagree with all of that? Yes, Judge. First, AFSCME did not argue before the ALJ, and they did not argue before the Labor Board, that the third factor of the test requires the application of the TAF factors. Respectfully, that argument's been waived. Second, although in the CALMAC case, the CALMAC Court did apply those factors, the ultimate question on the third factor is whether or not the impasse on the critical issue creates an insurmountable obstacle to the parties ever reaching an overall agreement. It's a little bit like if you went into a car dealership to buy a car in Springfield, and you have to live here in the summertime, and the car dealer said, we don't have any cars with air conditioning. But you know what? I can make a deal for you on the radio. You'd walk off the lot because the lack of air conditioning is an insurmountable obstacle to you buying any of those cars. You've got to be cool in the summertime. And that's what the Labor Board found here under that single critical issue test. With all due respect, they've waived any argument about the TAF factors applying on the third piece of it. But the appellate court, as I said, can affirm the Labor Board's finding of impasse for any reason that's in the record, even if the Labor Board did not find it. Although the Labor Board did not apply the TAF factors or did not make a conclusion under the TAF factors, the ALJ found that four of those five factors weigh in favor of impasse. And because that's in the record, you can affirm the Labor Board's ruling under the TAF factors as well. So even though the Board did not address the TAF factors, you're arguing that we can and should and can affirm on that basis? In Illinois Department of Central Management Services v. Illinois Labor Relations Board 382, 208 at page 221. This court in 2008 said, quote, it, quote, can affirm the Board's decision for any reason the record discloses regardless of whether the Board relied on that reason. End quote. That's this court's ruling. Well, but that means we would be in the first instance without the Board's input or analysis applying the five TAF factors. Well, you would have the input of the Board because the Board adopted the ALJ's findings, and the ALJ found that four of those five factors weigh in favor of impasse. Well, what we wouldn't have is the Board saying, here are the five TAF factors, and here are our conclusions on these matters, which is the very question I asked Mr. Yilkage. If there were alternative findings made, you didn't ask for alternative findings. You could have asked the Board, say, by the way, terrific decision. We really like it, and the critical single issue test is a good one. Would we have won as well even if under the traditional TAF factors? We did not file a motion to reconsider. Well, it's a little tricky to file a motion to reconsider when you've won. Right. But you could have suggested maybe an alternative grounds, or when you argued to the Board, argue alternative grounds. We did argue both, Judge. We argued both the TAF factors and we argued single critical. And suggest that, by the way, why don't you make findings on both of these saying that we win? We made that suggestion, Judge, over and over in our briefs. But they didn't do it. But they didn't do it. But this Court can affirm for any reason that's in the record, even if the Board didn't rely on that reason, that was what you said ten years ago in the case that I just cited. The case requires this Court to determine whether, once you decide this case, I only have two minutes left, whether it will continue to even be possible in Illinois for public sector employers to reach impasse with their collective bargaining partners. If the State and AFSCME are not at impasse in this case, after bargaining for 67 days, the longest in their 30-year history, reaching impasse on multiple issues, some of which were found to create an insurmountable obstacle to reaching an overall agreement, and being left at the end more than $3 billion apart, then this can be... Which is the same as the previous negotiations, 2012-15. It was a $3 billion difference. We were $3 billion apart in January of 2016 between our last proposal and their last proposal. Which is the same as the previous contract. Was their proposal the same as the previous contract? The AMJ said that you were basically $3 billion apart the last time you guys were negotiating. Not at the end of negotiations, Judge. No, not after 67 days. We were not $3 billion apart. We had a deal last time. We had a deal last time. But part of what you were arguing was this $3 billion difference is so significant, yet you've been there before. Perhaps we have been there before, Judge, but never at the end of our bargaining. Not after the longest bargaining in history. So... Let me just ask one other question about this. Yes, Judge. In talking about the discovery issues, you addressed one of them with regard to the idea of merit pay and all that. You said, well, they're never going to agree. But Mr. Jokic raised, if I remember correctly, four different areas of material that they wanted, and you said you'd provide, or the ALJ said you should have. Why didn't you provide that other stuff? Well, Judge, we've gone into this at length in our brief. It's a complicated thing. But I will say that we provided them with a huge amount of information. If the question is with regard to health insurance, first of all, they waited almost ten months before asking for the health insurance information. We asked in June, which was midway through the negotiations. I see my time is up. You can go ahead and answer the question. May I answer the question? Thank you, Your Honor. We asked in June to form a committee to exchange information. They didn't want to do that in June. Finally, in September, the parties formed a health insurance committee for the purpose of exchanging information. We exchanged a lot of information on health insurance. They claimed that there was some additional information that they wanted. They didn't receive it. It wasn't, in our minds, material. There hadn't been substantial movement on health insurance from their side. And on top of it, I believe the ALJ found that that did not cause the impasse. Thank you, counsel. Thank you, Your Honor. Thank you, Your Honor. So I'll try to do what I can in five minutes. First of all, Mr. Bradley argues that we waive the argument with respect to the TAF actors. If you go to our reply brief on page four, there's our record citation to where we argued in our exceptions that the first part of the test set forth in CALMAT was not met because there was no overall impasse. An overall impasse is what the TAF actors are designed to mean. Second of all, we have the issue of, well, what does the Act provide with respect to pre-filed direct examination? 11C of the Act provides that testimony taken by the board or a member designated by the board or a hearing officer must be reduced to writing and filed with the board. A full and complete record shall be kept of all proceedings before the board, and all proceedings shall be transcribed by a reporter appointed by the board. We think that pretty strongly indicates that we're thinking about live testimony. And I would like to add in that respect that the testimony of the witnesses in question was not given to the union 30 days ahead of time. My recollection, and I didn't have time to check this, but my recollection is that we got the affidavits on Thursday and Friday and started the hearing the next Monday. And so in no way, shape, or form did we have that length of time to review. Mr. Bradley says you're the great beneficiary of this procedure. So the procedure was a procedure undertaken pursuant to an extraordinary timetable. A charge was filed in January. We were in hearing. A complaint was issued in March. A pretrial order was due just a couple weeks later where we had to identify witnesses and exhibits. We were in hearing by April. We had 25 days of hearing by June. And you would be hard-pressed to find any other labor board hearing that was conducted with the rapidity that this one was conducted. So I don't think we were the beneficiary of it. And again, I go back to what I know as a trial lawyer. I have seen witnesses get it wrong many times, both with me and with opposing parties, on direct examination. And I think there is a reason why you have a preference for live testimony. Finally, I would like to cite to the board footnote 16 of the decision of the labor board in this case on page 16. It says, in choosing to adopt the three-factor critical issue impasse test, we find it unnecessary to apply the five-factor test that the board has previously utilized to determine the existence of an impasse. So they explicitly said, we're not going to go there on the five factors. Now, on the five factors, the point that I would hope that you can take away is that the factor of contemporaneous understanding is really the most important factor. If you look at the NLRB cases that we cite in our brief, they all talk about, do both sides think negotiations are exhausting? Are they both at the end of their rope? Do they both think they can go no further? And it is only when both sides have a common understanding that they're at deadlock that you find impasse. Now, what does that say about public sector collective bargaining in Illinois? It says that there won't be a lot of impasses. Is that a bad thing? Well, you know, they wrote the National Labor Relations Act to deal with manufacturing. To keep industrial strife out of the streets and to put it in collective bargaining, to put it in grievance and arbitration. And that was a good thing. But the National Labor Relations Act, that deals with making widgets down the street, corn syrup or tractors. The Public Sector Labor Relations Act deals with the provision of essential public services. Services for foster children, services to people that are in state developmental centers, that are in state mental health institutions. Those are important. And the third party relies on them. And so to come down with a ruling that says the parties ought to make every last effort to make a deal before they declare impasse, that's not a bad rule in the public sector. We think it's an appropriate rule under the Act. And that's why we think that when you construe the Act, you should keep that in mind. Now, finally, on the issue of merit pay and insurance. On the issue of insurance, we specifically asked for information that would allow us to make proposals to save the state money. That was done in December. They asked us to reformulate the request. We did that. We stood out in the hallway with the chief negotiator of the state on January 6th and we said, if we do it this way, is that okay? And he said, great. And that was so that we could make concessions on the issues of deductibles, co-payments, co-insurance, out-of-pocket costs. He didn't say this is in good faith, it's too late. He didn't say anything of the sort. But two days later, the state declared impasse. And we think that their refusal to allow us to get the information we needed so that we could make proposals fatally taints that whole claim. Now, counsel, I have a copy of the letter that you sent regarding the division of time. And under that agreement, and I believe the way you have it set up today, you would have an additional five minutes of rebuttal. Thank you. And I'll ask that you come forward, counsel. All of AFSCME's arguments about this test and that test and the ULPs boil down to one thing. And you've heard essentially them just say it. You're being asked by AFSCME to effectively read impasse out of the law. I'm sorry, to effectively what? Read it out of the law. Oh, okay. Right? And in doing so, to consign public employers and their union counterparts to collective bargaining without end, even long after it is clear that no deal can be reached by further talking alone. Respectfully, the state asks this court to reject AFSCME's argument, which is contrary to the policy set forth in the Labor Act, and reaffirm the important role that impasse plays. The use of taft factors for how many years? The taft case, I think, was decided in 64. The Labor Act was passed in 84, so some time. I think it was 89 when they were first adopted. And impasse has been found under taft factors, has that been? Yes. So the fact that if we decided that, no, you should have used the five taft factors instead of the critical issue impasse, that's not going to mean that impasse goes away. I mean, impasses have been declared under the previous test just as well. True? Yes, Judge, but you would not be respecting the dictates of the Labor Act. Section 5 of the Labor Act expressly authorizes the Labor Board, not this court with all due respect, to develop and effectuate impasse resolution procedures. That's their statutory authorization. If they, in their wisdom, believe that a test, which has been used in the federal courts for decades, would be effective as an impasse resolution procedure, then this court should respect and give deference to the Labor Board's adoption of that test. And the Supreme Court has said that it's appropriate for the Labor Board to look to the federal law in construing the Labor Act. But doing so wouldn't be inconsistent with the requirement that's preexisting in other contexts, that if you're going to abandon the taft factor test and go for the single crucial issue test, to explain explicitly why you're doing that. They didn't do that here. By way of saying, you know, in the past we've done the taft factors. We're now called upon by CMS to provide the single critical issue test. We agree with CMS. We're going to now apply that test in the future, and here's why. Well, Judge. Counsel, I'm sorry. Allow me to kind of double up on you a little bit. Again, I keep coming back to the issue raised by opposing counsel. Did they properly apply this new test? Well, okay. Yes. Yes, they did, number one. Number two, they're not abandoning the taft test. This is another way of looking at impasse. So you don't have to decide today whether both tests would apply in all cases. It's at least, in my mind, conceivable there might be cases in which you would use one and cases where you would use the other. So no one's abandoning the taft test. No one's throwing out 30 years of legal precedent here. What they're saying is they're adopting a test that applies under certain, probably limited circumstances when the impasse over a single issue is so great, and that issue is so critical, that the parties will never be able to get to an overall agreement. It's like the air conditioning exam. Even with that explanation, doesn't prior Illinois Supreme Court, don't the prior decisions require them to explain why in this particular case, maybe the taft five-factor test would be appropriate in other cases, but in this particular one, we're going to adopt the single crucial issue test, and here's why. Well, Judge, with all due respect, their opinion is lengthy. They don't address that point, do they? Well, I believe that they do, Judge. I believe that they discuss why the single critical issue test should be applied. They discuss, and the ALJ, who took a little different view of it, discussed at length all of the federal decisions that apply it, and they're authorized to come up with these impasse dispute resolution procedures by statute, and this Court should defer to them when they use their labor expertise to do so, and not second-guess them. For all those reasons, we would ask that you affirm the labor boards. Thank you very much, Counsel. We'll be in recess and take this matter under advisement.